DEBEVOISE & PLIMPTON LLP                    ELECTRONICALLY FILED
Joseph P. Moodhe (JM 6068)
David M. Bigge (DB 8579)
919 Third Avenue
New York, New York  10022
(212) 909-6000

*Attorneys for Defendants Vivendi S.A., the Benefit
Equalization Plan of Vivendi S.A., and the Human
Resources Committee of the Board of Directors of Vivendi
S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

EDGAR BRONFMAN, JR.,                                  :

                   Plaintiff,                        :

       v.                                                :

                                : No. 07-CV-2875 (VM)

VIVENDI S.A., THE BENEFIT EQUALIZATION PLAN
OF VIVENDI S.A., AND THE HUMAN RESOURCES          :
COMMITTEE OF THE BOARD OF DIRECTORS OF
VIVENDI S.A.,                                         :

                 Defendants.                       :

-------------------------------------------------------------------- x

## DECLARATION OF DAVID M. BIGGE
### IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

I, David M. Bigge, declare as follows:

1.    I am associated with the law firm of Debevoise & Plimpton LLP, counsel to Defendants Vivendi S.A., the Benefit Equalization Plan of Vivendi S.A., and the Human Resources Committee of the Board of Directors of Vivendi S.A., and am resident in the firm's New York office.

2.    I make this Declaration to put before the Court certain documents related to Defendants' Motion to Dismiss.

3.    Attached to this Declaration as Exhibit A is a true and correct copy of the Benefit Equalization Plan of Vivendi S.A., originally adopted  by The Seagram Company Ltd. ( "SCL" and now known as Vivendi Canada Inc.) before  SCL was combined with certain companies to create Vivendi Universal S.A. (now known as Vivendi S.A.).

4.    Attached to this Declaration as Exhibit B is a true and correct copy of the Termination Agreement among Vivendi Universal S.A., the Seagram Company Ltd., and Edgar Bronfman, Jr., dated December 20, 2001.

*   *   *   *   *

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  New York, New York
         May 8, 2007


                                     _/s/ David M. Bigge_____

                                     David M. Bigge (DB 8579)

2

# Exhibit A

# BENEFIT EQUALIZATION PLAN

## (Supplemental Executive Pension Benefits)

### Outline

1.  **Objective**

    The objective is to grant participants additional retirement benefits over those provided by the JES Pension Plan by recognizing management incentive awards as compensation and by providing additional years of service credit and to permit senior executives employed in mid-career to, in effect, receive additional years of service credit under the JES Pension Plan, and thereby aid the Company in attracting, retaining and motivating highly skilled senior executives.

2.  **Participation**

    Participants are those senior executives selected by the Human Resources Committee of SCL.

3.  **Pension Credit**

    To the extent outlined below participants will be credited with additional continuous service for the purpose of calculating the participant's total pension.

    (a)  If a participant retires with at least 10 years of regular continuous service under the JES Pension Plan and after attaining age 65, one year of additional service will be provided for each year of actual service before age 65, up to a maximum of 15 additional years provided that the total of actual service and additional service will not equal more than 35 years. The table following this outline illustrates how this additional service is granted.

    For example, if a participant is hired at age 45 and retires at age 65, he will be credited with a total of 35 years of service (20 years regular service plus 15 years additional pension credit service).

4/83

(b) If a participant retires at age 65 and with at least 35 years of regular continuous service under the JES Pension Plan, the participant will be treated as having 40 years of service. If a participant retires prior to age 65 with more than 35 years of actual service, he will receive credit for all years of actual service up to 40 years.

For example, a participant who is hired at age 29 and retires age 65 will be credited with a total of 40 years of service. This is because the participant had 36 years of regular service at age 65 retirement and, therefore, would receive an additional 4 years of pension service credit. Furthermore, a participant who is hired at age 20 and retires at age 65 will be credited with a total of 40 years of service. This is because the participant had 45 years of actual service.

(c) If a participant retires at Company request on or after age 60 but prior to age 65, additional service (but not actual service) will be determined as though the executive were age 65 (to a maximum of 35 years) and the maximum permissible years of additional service will be increased to 20 years. Such early retirement is at the request of the Company and at its sole discretion.

For example, if a participant is hired at age 45 and asked to retire at age 60, he would be credited with a total of 35 years of service, i.e., 15 years of actual service and 20 years of additional service.

(d) Under special circumstances, the JES Human Resources and Compensation Committee at its sole discretion may waive the age 60 retirement for executives with 10 or more years of service who retire at Company request.

(e) A maximum of 5 years credit toward both actual and additional pension service will be provided in the event of disability.

4/83

For example, a participant who is hired at age 50, is disabled at age 55 and retires at Company request at age 60, will be credited with a total of 25 years of service. This total consists of 10 years regular service, 10 years pension credit supplement and 5 years additional pension credit to age 65.

4.    Pension Calculation

Pensions will be based upon average final compensation which includes the regular annual management incentive award (not long-term incentive) in addition to base salary. The average final compensation used will be an average of the combined salary and regular annual management incentive award for the five years of highest combined salary and regular annual management incentive award during the final ten years of employment.

Benefits paid under the Benefit Equalization Plan will equal the amount that would have been paid to the participant for life under the JES Pension Plan formula recognizing (1) total compensation as defined and (2) total service credit as defined less any benefit payable under provisions of the JES Pension Plan or any plan of a predecessor employer. The total benefit is calculated without regard to limitations imposed by Section 415 of the internal Revenue Code which limits the maximum pensions payable under qualified plans.

5.    Spouse Benefits

The surviving spouse benefit which was previously part of the Benefit Equalization Plan is now provided under the Executive Group Term Life Insurance Program. The face amount of insurance is payable upon death, in one lump some or at the election of the beneficiary in monthly installments. (For defails, see the description of "Senior Executive Group Term Life Insurance.")

6.    Competitive Activity

A participant may forfeit benefits otherwise payable under the Benefit Equalization Plan if he engages in competition with or divulges trade secrets of any of the Seagram companies.

4/83

7.  Adjustments to Benefits

Benefits paid under the Benefit Equalization Plan will be subject to the same cost-of-living adjustments and benefit improvement provisions similar to those applied by the regular JES Pension Plan.

8.  Effective Date

The plan as amended and restated effective September 1, 1981, applies only to senior executives who are regular full-time employees on or after September 1, 1981.

4/83

## ADDITIONAL SERVICE CREDIT AT AGE 65

| Age At Employment | Actual Service To Age 65 | | Additional Credit To 15 Year Maximum | | Total Credit To 35 Year Maximum* |
|---|---|---|---|---|---|
| 35 Years | 30 | + | 5 | = | 35 |
| 40 Years | 25 | + | 10 | = | 35 |
| 45 Years | 20 | + | 15 | = | 35 |
| 46 Years | 19 | + | 15 | = | 34 |
| 47 Years | 18 | + | 15 | = | 33 |
| 48 Years | 17 | + | 15 | = | 32 |
| 49 Years | 16 | + | 15 | = | 31 |
| 50 Years | 15 | + | 15 | = | 30 |
| 51 Years | 14 | + | 14 | = | 28 |
| 52 Years | 13 | + | 13 | = | 26 |
| 53 Years | 12 | + | 12 | = | 24 |
| 54 Years | 11 | + | 11 | = | 22 |
| 55 Years | 10 | + | 10 | = | 20 |

*For individuals with 35 years of actual service, an additional 5 years of service credit is granted to a combined maximum of 40 years.

4/83

JOSEPH E. SEAGRAM & SONS, INC.

BENEFIT EQUALIZATION PLAN

1.  **Purpose**

The purpose of this Plan is to enable the Company to offer selected key employees retirement benefits in addition to those provided by the Pension Plan of the Company, and thereby aid the Company in attracting, retaining and motivating highly skilled senior executives.

2.  **Definitions**

"Additional Service" shall mean service as provided in Section 5(b).

"Average Final Compensation" shall mean the amount determined pursuant to Section 6.

"Board of Directors" shall mean the Board of Directors of Joseph E. Seagram & Sons, Inc.

"Committee" shall mean the Human Resources Committee of the Board of Directors.

"Company" shall mean Joseph E. Seagram & Sons, Inc. and its subsidiaries.

"Continuous Service" shall mean "continuous service", as that term is defined in the Pension Plan for purposes of determining the size of a participant's Pension Plan benefits, plus (i) period deemed to be continuous service under Section 5(c) of this Plan and (ii) any period of service with The Seagram Company Ltd. or any of its subsidiaries which is not treated as continuous service for this purpose under the Pension Plan and which occurs immediately prior to the participant's employment with the Company, in all events determined without regard to any limitation in the Pension Plan on the number of years of continuous service. For this purpose a "subsidiary" of The Seagram Company Ltd. is any entity in which The Seagram Company Ltd. has, directly or indirectly, a 50% equity interest.

"Employee" shall mean any person (including an officer or director) employed by the Company on a salaried basis.

4/83

"Participant" shall mean a key employee selected to participate in the Plan.

"Pension Credit Service" shall mean the amount determined pursuant to Section 5.

"Pension Plan" shall mean the Pension Plan for the Employees of Joseph E. Seagram & Sons, Inc. and Subsidiaries.

"Plan" shall mean the Joseph E. Seagram & Sons, Inc. Benefit Equalization Plan.

"Retirement" shall mean Deferred Retirement, Normal Retirement, Special Early Retirement, Early Retirement or Disability Retirement, all as defined in the Pension Plan.

3.    **Administration**

The Plan shall be administered by the Committee. The Committee shall have the full authority to interpret the Plan, to establish rules and regulations relating to the Plan, and to employ and rely on such legal counsel, actuaries and accountants as it may deem advisable to assist in the administration of the Plan. The Committee's interpretation of the Plan, and all actions taken within the scope of its authority, shall be final and binding on the Company, its shareholders and its employees, former employees and beneficiaries.

4.    **Participation**

The Committee shall, from time to time, designate those key employees who shall be eligible to participate in the Plan. No employee or other person shall have any claim or right to participate in the Plan.

5.    **Determination of Pension Credit Services**

(a) "Pension Credit Service" shall be equal to the sum of all years of continuous service and all years of additional service, up to the maximum permitted under the Plan. The maximum number of years of pension credit service which may be credited to a participant is the greater of (i) 35 years; or (ii) total years of continuous service up to 40

4/83

years; provided, however, that if the participant attains age 65 while employed by Company and has been credited with 35 or more years of continuous service, the participant shall be credited with 40 years of pension credit service under the 1

(b) "Additional Service" shall be a number of years of service equal to the sum of the participant's continuous service up to a maximum of 15 years plus, in the case of any participant whose retirement is at the request of the Company after attaining age 60 but prior to age 65, the number of years in the period between his retirement date and his 65th birthday. No participant shall be credited with any additional service unless the participant has attained 10 years of continuous service, and either:

   (i)    has attained age 65;

   (ii)   has commenced retirement at the request of the Company after attaining age 60; or

   (iii)  has specifically been granted additional service by the Company.

(c) Solely for the purpose of this Plan, any period, not in excess of 5 years, during which a participant is entitled to payments under the disability salary continuation plan of the Company shall be deemed to be continuous service under the Plan.

6.    Average Final Compensation

"Average Final Compensation" shall mean the average final compensation under the Pension Plan calculated, solely for the purpose of this Plan, by including in the participant's compensation any regular annual management incentive award (as described in the Management Incentive Plan of the Company) granted to the participant. Regardless of the actual date of payment, a management incentive award will be considered as compensation paid in equal installments for each month of employment in the fiscal year for which the manage-

4/83

ment incentive award is being granted. Furthermore, for the purpose of computing average final compensation under this Plan, annual compensation during any period of service credited under Section 5(c) shall be equal to the compensation, including management incentive award, which the participant earned during the year preceding disability.

7.   Benefits

(a) The Company shall pay to each participant a monthly pension benefit equal to the excess of the amount calculated under Section 7(b) over the amount calculated under Section 7(c).

(b) The amount calculated under this Section 7(b) shall be the monthly pension payable to the participant under the provisions of the Pension Plan, provided that the amount of the pension shall be determined:

   (i)     by utilizing the participant's pension credit service and average final compensation;

   (ii)    without regard to any reduction attributable to Section 415 of the Internal Revenue Code; and

   (iii)   without regard to any reduction attributable to any survivor's pension payable under the Pension Plan to the participant's spouse.

(c) The amount calculated under this Section 7(c) shall be the sum of:

   (i)     the monthly pension payable to the participant under the Pension Plan, plus

   (ii)    the equivalent monthly amount, computed on a straight life basis, of any pension payable to the participant from another employer or other employers (or from any plan or program maintained by any such employer) for service rendered prior to the participant's employment with the Company, but only to the

4/83

extent that the pension provided by the prior employer(s) is attri

number of years of service not in excess of the number of years c

service granted under the Plan.

(d) Except as otherwise provided herein, benefits payable under this plan sh

at the same time and subject to the same conditions as the benefits unde

Plan which they supplement; *provided, however*, that (i) all payments under this Plan

shall cease with the payment for the month of the participant's death, (ii) no death

benefit shall be payable under this Plan and (iii) if retirement benefits under the Pension

Plan are increased, the pension benefits of participant receiving retirement benefits

under this Plan shall be increased by the same percentage amount.

8.    **Employment with a Competitor**

Notwithstanding any other provisions of the Plan, if the Company finds that a participant

(including a participant in receipt of a pension or who is eligible for a deferred pension as a

consequence of his retirement or termination) either (a) has engaged directly or indirectly,

either personally or as an employee, agent, partner, shareholder, officer or director of, or

consultant to, during the period commencing with the participant's employment with the

Company and concluding 5 years following the date of his retirement or termination of

employment, any entity or person engaged in the manufacture or wholesale distribution of

alcoholic beverages or any other business in which The Seagram Company Ltd. or any of

its affiliates is engaged, and in the opinion of the Committee such entity or person has

engaged in competition with The Seagram Company Ltd. or any of its affiliates, or (b) at

any time divulged to any person or entity other than The Seagram Company Ltd. or any

of its affiliates any of the trade secrets, methods, processes or other proprietory or confi-

dential information of The Seagram Company Ltd. or any of its affiliates, any benefits

otherwise payable in the future under this Plan may be reduced, suspended or cancelled.

4/83

For the purpose of this section, a participant shall be deemed not a shareholder of a competing entity if the participant's record and beneficial ownership amount to not more than 1 percent of the outstanding capital stock of any company subject to the periodic and other reporting requirements of Section 13 or Section 15(d) of the Securities Exchange Act of 1934, as amended.

9.   Miscellaneous Provision

(a) This Plan may be terminated at any time by the Board of Directors in which event the rights of participants to their pension benefits accrued under this Plan up to the date of termination (based on the participant's pension credit service and average final compensation on the date of termination) shall vest, subject to Section 8 of the Plan. This Plan may also be amended at any time by the Board of Directors, except that no such amendment shall deprive any participant of the supplemental pension benefit as calculated according to Section 7 of this Plan at the time of such amendment.

(b) Benefits payable under this Plan shall not be funded and shall be paid out of the general funds of the Company.

(c) Except as required by any applicable law, no benefit under this Plan shall in any manner be anticipated, assigned or alienated, and any attempt to do so shall be void.

(d) The establishment of this Plan shall not be construed as conferring any legal rights upon any employee or other person for a continuation of employment, nor shall it interfere with the rights of the Company to discharge any employee and to treat him without regard to the effect which such treatment might have upon him as a member of this Plan.

(e) The Company shall have the right to deduct from each payment to be made under this Plan any required withholding taxes.

4/83

(f) This Plan shall be construed, administered and enforced according to the laws of the State of New York.

10. **Effective Date**

The Plan shall be effective September 1, 1981 and shall apply only to individuals who are regular, full-time employees on or after September 1, 1981. The benefits of individuals whose regular, full-time employment terminated prior to September 1, 1981 shall be determined under the Benefit Equalization Plan in effect at that time.

4/83

# Exhibit B

## TERMINATION AGREEMENT

AGREEMENT, dated as of December 20, 2001, by and among Vivendi Universal, S.A. ("Vivendi Universal"), The Seagram Company Ltd. (the "Company") and Edgar Bronfman, Jr. (the "Executive").

WHEREAS, the Company and the Executive are parties to an employment agreement, dated December 8, 2000 (the "Employment Agreement"), that provides for certain arrangements in connection with the Executive's termination of employment;

WHEREAS, in connection with the Employment Agreement, Vivendi Universal, the Company and the Executive entered into a matching agreement, dated December 8, 2000 (the "Matching Agreement"), that provides for certain arrangements relating to, among other things, the Four Seasons Restaurant and the Art Collection (each, as defined in the Matching Agreement); and

WHEREAS, Vivendi Universal, the Company and Executive have agreed upon and wish to confirm various arrangements relating to (i) the Executive's termination of employment with Vivendi Universal and the Company and (ii) the Executive's provision of certain advisory services to Vivendi Universal following his termination of employment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.     Resignation as Executive Vice Chairman.  Effective December 31, 2001, the Executive hereby resigns from his position as Executive Vice Chairman of Vivendi Universal and the Company and all other executive positions of Vivendi Universal and its subsidiaries and affiliates and shall become the non-Executive Vice Chairman of the Board of Directors of Vivendi Universal. The foregoing resignations shall not affect the Executive's status as an ongoing employee of the Company through the Termination Date (as defined in Section 2 hereof).

2.     Termination of Employment; Certain Compensation Upon Termination.

(a)     The Executive shall remain on the Company's payroll, and shall continue for all purposes to be treated as an employee of the Company (including, without limitation, for purposes of determining the Executive's rights pursuant to the Matching Agreement) through and including March 31, 2002 or, if earlier, the date of termination of the Executive's employment by reason of death or Disability (as defined in the Employment Agreement), at which time the Executive's employment with the Company shall terminate (the "Termination Date"). Except as specifically provided otherwise in this Agreement, the termination of Executive's employment shall be treated for purposes of the Employment Agreement as a termination pursuant to which the Executive is entitled to the payments and benefits set forth in Sections 8(c)(iii) thereof, as well as Sections 5, 8(e), 9, 11(i), 11(j), 11(k), 11(l) and 11(m) thereof.

    (b)    Promptly following the Termination Date, the Company shall pay the Executive his Base Salary and Perquisites (each as defined in the Employment Agreement) through the Termination Date, to the extent unpaid or not previously provided, and reimbursement for any unreimbursed business expenses properly incurred by the Executive in accordance with the Company's policy prior to the Termination Date. In addition, the Company shall provide the Executive with such Employee Benefits (as defined in the Employment Agreement), if any, to which the Executive may be entitled.

    (c)    On or before April 15, 2002, the Company shall pay the Executive a lump sum cash payment in an amount equal to $12,000,000, which shall fully satisfy any Company obligations pursuant to Sections 8(c)(iii)(B) and (C) of the Employment Agreement.

    (d)    Notwithstanding any minimum bonus required pursuant to Section 4 of the Employment Agreement, the Executive shall receive a bonus in respect of the Company's short fiscal year commencing July 1, 2001 and ending December 31, 2001, in an amount determined by the Chief Executive Officer of Vivendi Universal based on the actual bonuses paid to executives of Vivendi Universal's corporate division, at the same time and in the same manner as such bonuses are paid to such other executives. The Executive shall not be entitled to any annual bonuses for any period after December 31, 2001, and the Executive acknowledges and agrees that no amount is payable to the Executive pursuant to Section 8(c)(iii)(D) of the Employment Agreement.

    (e)    Notwithstanding the provisions of Section 8(c)(iii)(E) of the Employment Agreement, all unvested options to purchase Vivendi Universal ADSs outstanding on the Termination Date shall continue to vest and become exercisable in accordance with their terms for so long as the Executive continues to provide advisory services under the Consulting Agreement. Notwithstanding the foregoing and the applicable stock option agreements, and notwithstanding the special provisions of Section 8(c)(iii)(E) of the Employment Agreement relating to the Sign-On Options and Performance-Based Options (each as defined in the Employment Agreement), which special provisions shall cease to apply, the Sign-On Options and Performance-Based Options (and additional options specified below) shall be subject to the following vesting and exercisability provisions:

    (i)    the December 11, 2000 SO I grant of options to purchase 515,000 Vivendi Universal ADSs, with an exercise price per ADS of $67.85, vested with respect to 343,333 Vivendi Universal ADSs on December 11, 2001, and shall vest with respect to the remaining 171,667 Vivendi Universal ADSs on December 11, 2002;

    (ii)    the December 11, 2000 grant of over-performance options to purchase 500,000 Vivendi Universal ADSs, with an exercise price per ADS of $67.85, shall vest with respect to all 500,000 Vivendi Universal ADSs on December 11, 2003; provided, however, that such options shall not be exercisable until December 11, 2006 unless the terms of the option grant permit an earlier exercise;

    (iii)    the October 10, 2001 SO I grant of options to purchase 627,000 Vivendi Universal ADSs, with an exercise price per ADS of $44.25, shall vest with respect to 209,000 Vivendi Universal ADSs on October 10, 2002, with respect to 209,000 Vivendi Universal ADSs on October 10, 2003 and with respect to the remaining 209,000 Vivendi Universal ADSs on October 10, 2004;

provided, however, that (x) if the Executive's advisory services under the Consulting Agreement are terminated by the Executive, all outstanding options described in clauses (i), (ii) and (iii) of this Section 2(e) (the "Relevant Options") that are unvested as of the date of the termination of such services shall, at the sole discretion of Vivendi Universal, expire and be forfeited by the Executive, and all Relevant Options that are vested as of such date shall become or remain exercisable in accordance with their terms (treating for such purpose the date of the termination of the Executive's advisory services under the Consulting Agreement as the date of the Executive's termination of employment), or (y) if the Executive's advisory services under the Consulting Agreement are terminated by Vivendi Universal, or are terminated by reason of the Executive's death or Disability, all Relevant Options shall fully vest as of the date of the termination of such services and shall remain exercisable for the duration of their full original terms.

(f)    Vivendi Universal and the Company acknowledge and agree that the Executive's termination of employment for any reason shall be treated as a "retirement" for purposes of all stock option plans or agreements and other stock-based plans, programs or agreements of the Company in which the Executive participated as of December 8, 2000, or any successor plans, programs or arrangements, and that upon the Termination Date all such stock options (which, for the avoidance of doubt, include only those options outstanding as of December 8, 2000) (including the options to acquire Vivendi Universal ADSs into which such stock options were converted in connection with the consummation of the transactions contemplated by the Merger Agreement (as defined in the Employment Agreement)) shall be exercisable for the duration of their full original terms.

(g)    The Executive shall be provided, which shall fully satisfy any Company obligations under the provisions of Section 8(c)(iii)(F) of the Employment Agreement, with continued medical, life insurance and disability coverages through December 31, 2004, at the level provided to the Executive immediately prior to the Termination Date for the Executive and his spouse and dependents; provided, however, that if the Executive becomes employed by a new employer, such continuing coverage will become secondary to any coverage afforded by the new employer.

(h)    The Executive shall receive, as of December 31, 2001, credit equal to an additional three years of service and age beyond that accrued as of the Termination Date for purposes of eligibility for retirement, for early commencement or actuarial subsidies under any Vivendi Universal or Company (or its affiliate) pension, medical reimbursement or life insurance plan or arrangement in which the Executive participates through and including the Termination Date, under which employee plans and arrangements the Executive shall be able to retire as of any Termination Date occurring on and after December 31, 2001, and the Executive shall be fully vested in any unfunded pension benefit provided under any nonqualified pension plan, program or arrangement in which the Executive participates (including, without limitation, the Company Benefit Equalization Plan and the Company Supplemental Retirement Account Plan). The Executive shall cease to accrue additional credit for service and age under such arrangements as of January 1, 2002. The Executive's retiree welfare benefits under the employee plans and arrangements described above shall become effective as of January 1, 2005 (following the expiration of the continuation coverages provided under Section 2(g) hereof). Compliance with the foregoing provisions of this Section 2(h) shall fully satisfy any Company obligations under the provisions of Sections 8(c)(iii)(G) and (H) of the Employment Agreement.

4

(i)    The Executive shall receive, which shall fully satisfy any Company obligations under the provisions of Section 8(c)(iii)(I) of the Employment Agreement, reimbursement for all reasonable expenses incurred by the Executive for professional outplacement services by qualified consultants selected by the Executive, for the period commencing on the Termination Date and ending on December 31, 2004 (or, if earlier, until the date on which the Executive first obtains full-time employment following the Termination Date).

(j)    If any of the benefits described in this Section 2 (including those described in Section 2(h)) that are intended to be provided under a qualified pension plan of the Company or Vivendi Universal (as applicable) cannot be provided due to the qualification provisions of the Internal Revenue Code of 1986, as amended (the "Code"), the benefit, or its equivalent in value, shall be provided under a nonqualified pension plan of the Company or Vivendi Universal, as applicable.

3.    Consulting Agreement.  Vivendi Universal and the Executive shall enter into a consulting agreement, dated the date hereof (the "Consulting Agreement"), pursuant to which the Executive shall provide consulting services as an advisor to the Chairman of Vivendi Universal for a term commencing on the Termination Date and ending no later than December 31, 2004, on the terms and conditions set forth in the Consulting Agreement.

4.    The Matching Agreement.

(a)    For the avoidance of doubt, the Executive acknowledges that the Executive shall not be treated (for purposes of the Matching Agreement or otherwise) as an employee of the Company or any of its affiliates during the period during which the Executive provides advisory services under the Consulting Agreement, and that the Executive's rights pursuant to the Matching Agreement with respect to the Four Seasons Restaurant shall expire following the expiration of the 10-day period following the Termination Date, unless such rights are exercised before such expiration in accordance with the provisions of the Matching Agreement.

(b)    The Executive shall have the right to purchase from the Company certain selected items from the Art Collection located in the Executive's New York, Paris and Los Angeles offices, including the Matta painting in Executive's New York office. The Executive shall provide the Company, as soon as practicable following the date hereof but in no event later than the Termination Date, with the list of the items from the Art Collection that are located in the Executive's New York, Paris and Los Angeles offices that the Executive desires to purchase (the "Selected Office Art"), and the Company shall obtain the Appraised Art Value (as defined below) of the Selected Office Art and provide such Appraised Art Value to the Executive in a written notice (which shall be treated as the "Art Sale Notice" as such term is used in the Matching Agreement). For purposes of this Section 4, the "Appraised Art Value" shall mean the cash price at which a willing seller would sell and a willing buyer would buy each item of Selected Office Art, as determined in accordance with customary practice, by an appraiser jointly selected by the Executive and Vivendi Universal. For a period of fifteen (15) days following the receipt of the Appraised Art Value for the Selected Office Art, the Executive shall be entitled, but shall not have the obligation, to purchase one or more of the Selected Office Art at the Appraised Art Value thereof. The procedures outlined in Section 3(b)(ii) of the Matching Agreement shall govern the purchase and sale of the Selected Office Art.

(c)    The Executive shall be entitled to take the two chairs in Executive's Paris office that were paid for by the Executive (as previously discussed between the Executive and Vivendi Universal). The Executive shall be entitled to purchase (at the cost to Vivendi Universal, the Company or their relevant affiliate, as applicable) selected office furnishings in the Executive's Paris and Los Angeles offices (as previously discussed between the Executive and Vivendi Universal), a list of which has been provided (or will be provided shortly after the date hereof) by the Executive to Vivendi Universal (it being understood that the Executive shall be entitled to acquire the office furnishings from his New York office for no cost in accordance with Section 6(b) below).

5.    Charitable Gift. Vivendi Universal shall make a contribution of $1,000,000 in the name of the Executive to a tax-exempt charitable organization qualifying under Section 501(c)(3) of the Code, selected by the Executive, and at such time during 2002 as the Executive directs, in recognition of the Executive's twenty years of service to the Company.

6.    Offices and Equipment; Assistants; Security Arrangements.

(a)    The Executive shall continue to have the use of his office at 375 Park Avenue, New York, New York, until the Termination Date. The Executive may elect to vacate such office at any time after December 31, 2001, but must vacate such office no later than the Termination Date. The Executive agrees to vacate his offices with Vivendi Universal and the Company in Paris and Los Angeles by January 31, 2002 and January 15, 2002, respectively.

(b)    The Executive shall be permitted to retain his home office equipment in New York and his laptop computer. The Company agrees to maintain the Executive's e-mail account until the later of (i) the termination of his advisory services under the Consulting Agreement and (ii) the first anniversary of the Termination Date. The Executive shall be permitted to take his current office furnishings in his New York office, and Vivendi Universal shall pay (or reimburse the Executive for) the costs of relocating such office furnishings to another location within New York City.

(c)    The Executive's three personal assistants in New York shall remain employees of the Company through the Termination Date, and their positions will then be eliminated, and each such employee shall receive severance compensation and benefits in accordance with the terms of the Company's severance plans (with any such employee receiving credit (i.e., additional age and service) for the severance period for purposes of the Company's benefit plans as if the employee had continued to work during such period). The Executive's personal assistant in Los Angeles shall be considered for other positions at Universal Studios and/or Universal Music in Los Angeles; if there are no other suitable positions available, such employee shall receive severance compensation and benefits in accordance with the terms of the Company's severance plans. The Executive's personal assistant in Paris shall be considered for other positions within Vivendi Universal in Paris; if there are no other suitable positions available, or if such employee declines to accept a new position, such employee shall receive severance compensation and benefits in accordance with Vivendi Universal's practices.

(d)    The Company shall continue to reimburse the Executive through December 31, 2002, for salary expenses for the security personnel currently provided at the Executive's residence in New York City (but not for expenses in respect of alarm

6

systems installation, gates to the property or other security-related capital expenses). The security driver for the Executive's spouse shall continue as an employee of Vivendi Universal through December 31, 2002 and shall continue to provide such services; thereafter, such employee shall be considered for other positions within Vivendi Universal; if there are no other suitable positions available, or if such employee declines to accept a new position, such employee shall receive severance compensation and benefits in accordance with Vivendi Universal's practices.

7.    Use of Airplane; Purchase of Helicopter Hours.  With the approval of the Chairman of Vivendi Universal, the Executive may continue to use the Company's aircraft, subject to its availability (i) through March 31, 2002, on the same basis as made available to the Executive on the date hereof; (ii) during the period commencing on April 1, 2002 and ending on December 31, 2002, for up to 37.5 hours; and (iii) during 2003 and 2004 (so long as the Executive is still providing advisory services under the Consulting Agreement), for up to 50 hours per year; provided, that for purposes of clauses (ii) and (iii), hours with other passengers shall be counted towards the 37.5 hours or 50 hours limitation, and hours of "deadhead" associated with any trip shall be counted towards such hours limitations on the basis of 50% of the actual time. The Executive shall have the right to purchase, at the cost to Vivendi Universal, any helicopter hours that Vivendi Universal determines to be surplus.

8.    Termination of Employment Agreement.  The parties hereto agree that, except as otherwise provided herein, and except for the provisions of Sections 8 (as modified herein), 9, 10, 11(c), 11(f), 11(i), 11(j), 11(l), and 11(m) of the Employment Agreement, which shall survive to the extent necessary for the intended preservation of the rights and obligations of the parties thereunder, the Employment Agreement shall hereby terminate and be of no further force and effect.

9.    Non-Disparagement; Cooperation.

(a)    The Executive agrees that during the period from the date hereof through December 31, 2004, he will not make publicly any statements, written or oral, which would reasonably be expected to disparage or damage Vivendi Universal or any of its subsidiaries and affiliates, or any of its or their present or former directors, officers, employees, agents or representatives; provided, that the foregoing shall not be construed so as to prevent the Executive from discharging his duties as a director of Vivendi Universal or any of its affiliates). Vivendi Universal agrees that, during the period described in the foregoing sentence, no director, officer, or employee of Vivendi Universal or any of its subsidiaries or affiliates shall be authorized or permitted to make any communication that would reasonably be expected to disparage the Executive or which would reasonably be expected to damage the Executive's professional or personal reputation (provided, that the foregoing shall not be construed so as to prevent any individual from discharging such individual's duties as a director of Vivendi Universal or any of its affiliates), and Vivendi Universal shall so instruct its directors, officers and employees.

(b)    The Executive shall provide reasonable cooperation in connection with any suit, action or proceeding (or any appeal from any suit, action or proceeding) which relates to events occurring during the Executive's employment with Vivendi Universal, the Company, their subsidiaries and affiliates, and their predecessors; provided,

that Vivendi Universal shall reimburse the Executive for expenses reasonably and actually incurred in connection with such cooperation.

10.     Entire Agreement.  This Agreement and the Matching Agreement contain the entire understanding of the parties concerning the subject matter hereof and supersedes all prior agreements, understandings, discussions, negotiations, and undertakings, whether written or oral, between the parties with respect thereto.  There are no restrictions, agreements, promises, warranties, covenants or undertakings among the parties with respect to the subject matter herein other than those expressly set forth herein. This Agreement may not be altered, modified or amended except by a writing signed by Vivendi Universal and the Executive.

11:     Severability.  In the event that any provision or portion of this Agreement shall be determined to be invalid, illegal or unenforceable for any reason the remaining provisions or portions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law.

12. .   Survival.  The respective rights and obligations of the parties hereunder shall survive any termination of this Agreement to the extent necessary for the intended preservation of such rights and obligations.

13.     Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York without reference to the principles of conflicts of law, and all actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in any federal or state court of competent jurisdiction, located in the Borough of Manhattan, New York.

14.     Withholding Taxes.  Vivendi Universal, the Company or any of their subsidiaries may withhold from any and all amounts payable under this Agreement any and all taxes as may be required to be withheld pursuant to any applicable law or regulation.

15.     Assignment.  This Agreement shall not be assignable by the Executive.  This Agreement shall be assigned, if the Executive consents, by Vivendi Universal or the Company to a person or entity which is an affiliate or a successor in interest to substantially all of the business operations of Vivendi Universal or the Company.  Upon such assignment, the rights and obligations of Vivendi Universal and the Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

16.     Successors; Binding Agreement.  This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

17.     Notices.  For the purpose of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below, or to such other address as either party may have provided to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

8

If to Vivendi Universal or the Company:

Vivendi Universal
375 Park Avenue
New York, New York 10152

Attention: John Borgia

If to the Executive:

to the most recent address of Executive set forth in the personnel
records of the Company

18.    Counterparts. This Agreement may be signed in counterparts, each
of which shall be an original, with the same effect as if the signatures thereto and hereto
were upon the same instrument.

*{remainder of this page intentionally left blank}*

9

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

VIVENDI UNIVERSAL, S.A.

By:
Name:
Title: _____ EVP  HR

THE SEAGRAM COMPANY LTD.

By:
Name:
Title: _____ EVP  HR

EDGAR BRONFMAN, JR.